IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:24cr16 |
| ) | |
| JOSEPH ALLEN, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS**

"Other." For her entire life, Joseph "Chi" Allen[1], has been an "other," never belonging anywhere. Born to a White mother and a Black father, Chi was a mixed-race child in Kansas, an outsider from the start. Abused, neglected, and rejected by her mother and her mother's new racist boyfriend, she was passed on to her mother's friends and maternal uncle. This further separated her from everything a child needs: affection, connection, nurturing. Chi became an object, a toy to be passed around. Then, like most toys, she was tossed aside, becoming another "other" – a ward of the state.

By the age of 8, her paternal grandparents took her in, but she remained an "other." There, Chi was one of four children, but she wasn't like them. Already showing signs of feminine preference in the way she presented herself to her grandfather and other male relatives, she was something the devil brought into the home.

Once Chi was old enough to leave, she did. And she became yet another "other," labeled with many slurs, an outcast of society searching for what she never had. In her

---

[1] Ms. Allen identifies as female and prefers to go by the name Chi Allen. Her pronouns are "she" and "her."

1

young mind, becoming a sex worker felt like a choice. She would still be somebody's "other," to be used by agreement, but she believed it was her choice this time. A choice she was never given before; a way to reclaim her power to decide who she can be, and how she can live free. But sadly, the path she chose resulted in her repeating history and losing the very control she valued. Joseph "Chi" Allen, now before this Court, will soon become new "others": a federal felon and a sex offender.

## **INTRODUCTION**

Joseph "Chi" Allen ("Ms. Allen" or "Chi"), by counsel, pursuant to Section 6A1.2 of the Sentencing Guidelines and the Court's Sentencing Procedures Order, respectfully states that she has no objections to the Pre-Sentence Report ("PSR"), and hereby states her position with respect to the sentencing factors. Ms. Allen is before this Court for sentencing after entering a plea of guilty on June 6, 2024, pursuant to a written plea agreement, to Counts 4 and 5 of the Superseding Indictment, which charge production of child pornography in violation of 18 U.S.C. § 2251(a), and Distribution of Images of Minors Engaging in Sexually Explicit Conduct in violation of 18 U.S.C. § 2252(a)(2). Sentencing is currently scheduled for October 17, 2024.

Ms. Allen's advisory guideline range is 360 months to life, restricted to a maximum of 360 months. The term of imprisonment is to be followed by a term of supervised release of 5 years to life. Ms. Allen respectfully requests that this Court impose a sentence of 15 years (180 months), to be followed by a 15-year term of supervised release. Such a sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

2

It is within this Court's discretion to impose a below-guideline sentence. *See Gall v. United States*, 128 S. Ct. 586, 602 (2007) (finding a sentence outside the Guidelines to be reasonable); *see also Kimbrough v. United States*, 128 S. Ct. 570 (2007) (noting that courts may vary from Guideline ranges based solely on policy considerations, including disagreement with the Guidelines); *Rita v. United States,* 127 S. Ct. 2456, 2465 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California*, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer bound by the Guidelines, but are required to consider them along with the sentencing goals in 18 U.S.C. § 3553(a)). The Supreme Court has time and again reiterated that "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring). A sentencing court "may not presume that the Guidelines range is reasonable," but must instead "make an individualized assessment based on the facts presented." *Gall,* 128 S. Ct. at 597.

In this case, a below-guideline sentence is sufficient to accomplish the purposes of sentencing. Considering the nature of the offense, as well as Ms. Allen's (1) personal history and characteristics, (2) mental health, (3) physical health, and (4) the unique and more punitive nature of incarceration she would face, a sentence of 15 years' incarceration is appropriate.

I.  **Background and Overview of Sentencing Request**

Ms. Allen is now almost 30 years old. On February 1, 2024, the FBI arrested her at her home without incident. After receiving her *Miranda* rights, she confessed. The

investigation remained ongoing. After the filing of a Superseding Indictment on April 9, 2024, Ms. Allen entered a guilty plea, pursuant to a written plea agreement, on June 6, 2024. She pled guilty to producing child pornography and distributing child pornography.

Ms. Allen has accepted full responsibility for her behavior, and she timely notified the government of her intention to plead guilty. In confessing her illegal activity, Ms. Allen admitted to behavior as set forth above regarding the actions in the Statement of Facts to which she pleaded guilty. Ms. Allen is adamant in her desire to obtain whatever treatment and assistance is available to help prevent her participation in any similar conduct again.

She continued to express her remorse, along with insight into the severity of her offense, when she was interviewed by the United States Probation Officer. PSR ¶ 28. At the time of sentencing, Ms. Allen will have been in custody for almost 10 months.

If Ms. Allen finally gets the treatment and counseling she needs, she will continue to stabilize. Ms. Allen's criminal behavior was wrong—and she knows that—but neither she nor society will benefit from the imposition of a prison term greater than 15 years. A sentence of not more than 180 months will promote respect for the law and adequately reflect the seriousness of her offense, while also providing Ms. Allen an opportunity to rehabilitate and succeed with treatment under the supervision of this Honorable Court.

## II.     Ms. Allen's History and Characteristics

Monique Baker and John Allen became involved in a committed relationship during their late 20's, resulting in their son, Joseph Allen, born in Pittsburg, Kansas.

4

Pittsburg is a small midwestern town on the Missouri border, towards the bottom of the two states. Although Ms. Allen remembers her father being in her life, her memories are very limited because John Allen died at the age of 29 due to being hit by a car. Chi was just 4 years old. PSR ¶ 62.

A child's parents are her first teachers, explaining the world in terms that a child can understand. Around the age of 4, a child should learn how to show empathy and often begins to exhibit signs of a "helper."[2] But abuse and neglect can short-circuit this process. "Children learn their self-worth from the reactions of others, particularly those closest to them. Caregivers have the greatest influence on a child's sense of self-worth and value. Abuse and neglect make a child feel worthless and despondent."[3]

In Ms. Allen's case, by the age of 4, her mother had chosen to live with a racist boyfriend who did not like her mixed-race child. So instead of learning what a child should, Ms. Allen was exposed to abuse – sexual, physical, verbal, and psychological – along with neglect and eventual rejection. Things became so bad at home that someone called child protective services, resulting in Ms. Allen being placed in a foster home for 8 months around the age of 6 or 7 years old.[4] Her mother's parental rights were terminated,

---

[2] *Important Milestones: Your Child By 4 years*, Centers for Disease Control, https://www.cdc.gov/ncbddd/actearly/pdf/checklists/CDC_-LTSAE-Checklists-with-Tips-4year-P.pdf (last visited October 2, 2024).

[3] *What is Child Trauma?*, pg. 5, The National Child Traumatic Stress Network, https://www.nctsn.org/what-is-child-trauma/about-child-trauma (last visited October 2, 2024).

[4] Ms. Allen did not discuss details of her foster care and attempts to obtain records were not fruitful.

and Ms. Allen moved in with her paternal grandparents, Johnnie, and Esther Kaye Allen. PSR ¶ 64.

Ms. Allen remembers being confused but happy to be in a stable home in a middle-class environment. However, her life did not suddenly become perfect. Three half-brothers also lived in the home; each 2 to 6 years older than Ms. Allen. Within a year of Ms. Allen's arrival, the oldest half-brother, Joshua Allen, began to molest her. The abuse continued for the next 3 years while Joshua was still in the home and included, on at least one occasion, a gun being pointed at Ms. Allen to force her acquiescence. PSR ¶ 65.

Around the age of 7, Ms. Allen recalls receiving some form of mental health treatment, including some hospitalization and generalized diagnoses of ADHD, manic depression, and bipolar disorder. PSR ¶ 73. Missing from that treatment, however, was follow-up on matters relating to gender and self-harm. To be fair, even today, the effects of childhood trauma remain an ongoing area of research. While those who provided Ms. Allen with assistance at the time thought they were doing their best, in retrospect, Ms. Allen's complex traumas, including those she had not disclosed, have had obvious impacts on her life. After all, "[c]omplexly traumatized children are more likely to engage in high-risk behaviors, such as self-harm, unsafe sexual practices, and excessive risk-taking . . . . They may also engage in illegal activities such as . . . substance use, assaulting others, stealing . . . and/or prostitution."[5]

---

[5] *What is Child Trauma?*, pg. 6, The National Child Traumatic Stress Network, https://www.nctsn.org/what-is-child-trauma/about-child-trauma (last visited October 2, 2024).

Ms. Allen knew she was "gay" around the age of 9 and "came out" to a female family member at 12 years old. That family member accepted her, but the male members of Ms. Allen's family were not so supportive. Instead, her paternal grandfather's initial reaction was to "beat the devil out." PSR ¶ 63.

Ms. Allen avoided school due to bullying she experienced due to her effeminate demeanor and poor academic performance. By the age of 16, she was using marijuana heavily, and she decided to leave school before completing the eleventh grade. At the same time, Ms. Allen moved in with Joshua Allen to have a place to stay, claiming that she had put the abuse she suffered behind her. PSR ¶¶ 65, 76, 81.

Without much education, and failing to pursue her general equivalency diploma, Ms. Allen used her self-taught skills with makeup and nails to make money. Finding that it was not enough, by the age of 19, she began working full-time as a sex worker. PSR ¶¶ 81-82, 84.

With such work comes substantial risks to one's life and health. In 2020, Ms. Allen met Charlie Cooke Debnam, and they moved to Raleigh, North Carolina. The committed relationship was filled with physical abuse, resulting in Ms. Allen leaving Mr. Debnam. However, Mr. Debnam and Ms. Allen remained friends until his tragic death on July 31, 2021, when he was shot during a volunteer event.[6] PSR ¶¶ 66, 93.

---

[6] Rodney Overton and Michael Prunka, *Man taken into custody for murder of beloved Raleigh drum major, Mass. Officials say*, CBS17 (Aug. 11, 2021), https://www.cbs17.com/news/local-news/wake-county-news/man-taken-into-custody-for-murder-of-beloved-raleigh-drum-major-mass-officials-say/ (last accessed Oct. 3, 2024).

7

Soon after Mr. Debnam's death, Ms. Allen returned to Virginia Beach, Virginia, living in a small rental apartment near the Oceanfront. Living as a sex worker, Ms. Allen presented herself as a transgender woman. This drew a more niche clientele with more unusual fetishes. At first, it was just fantasy talk and text, but it became increasingly vivid, including the presence of CSAM in 2022. During this period, Ms. Allen also relapsed into using methamphetamine and continued to use it several times a day up until the night of her arrest. Moreover, by this time, her risky behavior had resulted in a significant health issue. PSR ¶ 72.

Around mid-to-late 2022, Ms. Allen met Sean Halsey, who was both a customer and her meth provider. Over time, Mr. Halsey introduced the topic of taking his fantasy into reality. And over time, unfortunately, Ms. Allen consented.

### III. The Requested Sentence and the Applicable Sentencing Factors

Ms. Allen respectfully requests a sentence no greater than 15 years. Though this request represents a downward variance from the advisory range, it would be consistent with variances in similar cases. It would also be consistent with widespread recognition that the child pornography sentencing guideline is irrational and unduly harsh. Indeed, the guideline has fallen so out of favor that only by varying or departing substantially downward can the Court avoid unwarranted sentencing disparities.

Further, the stigma of a felony conviction, particularly a conviction for a sex offense, is more intrusive and pervasive today than ever before due to the availability of information on the internet. *See generally* Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington L. Rev. 1103 (2013) ("Today, convict status serves as a

perpetual badge of infamy, even serving to impugn reputation beyond the grave."). In addition to her status as a federal felon, Ms. Allen must register as a sex offender, making that information public and available to the community, including friends and neighbors. She also faces a lengthy term of federal supervision, from five years to as much as life.

No matter what sentence she receives, Ms. Allen will be supervised, placed on the sex offender registry, and prevented from working in several different professions. Even if she is sentenced to 15 years, Ms. Allen will still spend the entirety of her 30's in prison, and her life will be changed forever. More than fifteen years of incarceration would be unnecessary, destructive, and wasteful.

The Court also should not ignore Ms. Allen's characteristics that will make any period of incarceration more difficult for her. It should do what it can to ensure she benefits from treatment and counseling, which she is fully committed to pursuing.

Given Ms. Allen's age, history and characteristics, and the facts and circumstances of her offense, a sentence not greater than 15 years is sufficient to carry out the purposes of sentencing.

### A. The sentencing guideline range in Ms. Allen's case is overly punitive.

The sentencing guidelines in child pornography cases are universally recognized as inappropriately harsh. They contain enhancements that do nothing to distinguish between defendants based on culpability. In this case, the Court should be skeptical of the child pornography guidelines, flawed as they are, and recognize that they are only one of many relevant considerations. *See* 18 U.S.C. § 3553(a)(4).

The Guidelines range in Ms. Allen's case is greater than necessary to accomplish the goals as set forth in 18 U.S.C. §3553(a). The Guidelines do not take into account Ms. Allen's cooperation, her timely guilty plea, her acceptance of responsibility, her unique personal characteristics, the impact of her gender dysphoria on her incarceration, or her willingness to participate in offense-specific treatment along with any other treatment she may require.

Because of the Guidelines' structural flaws, the Judges of this Court have often concluded that the child pornography sentencing guideline range produces excessive sentencing ranges and have sentenced below the advisory ranges in appropriate cases. The Court should do so again here. Ms. Allen's case is an appropriate case to sentence well below the applicable advisory range.

**B. More than 15 years of incarceration would be greater than necessary to achieve specific deterrence and protect the public.**

An extended prison sentence cannot be justified on specific deterrence grounds because lengthier prison sentences do not achieve better recidivism rates. With respect to sex offenses, individual studies and meta-analyses consistently find that "incarceration has little, if any, impact on recidivism." Kevin L. Nunes et al., *Incarceration and Recidivism among Sexual Offenders*, 31 Law & Human Behavior 305, 314 (2007). Indeed, not only is the evidence in support of incarceration's deterrent effect "unimpressive;" the Nunes study found that, "[c]ounterintuitively, some [sex] offenders may actually experience incarceration as *less* aversive that some alternative sanctions." *Id.* at 306.

There are better ways to reduce the likelihood of recidivism. Already, as a condition of the Court's sentence, Ms. Allen will receive extensive sex offender treatment. This treatment will include an offense-specific evaluation and a subsequent referral to an offense-specific treatment program. Ms. Allen will be subject to regular polygraph examinations, individualized treatment, and continued supervision by the Court long after her release from prison. Reviews of sex offender treatment programs show that cognitive-behavioral therapy, relapse prevention, and self-regulation have proven successful in treating offenders. *See, e.g.*, Tony Ward, Theresa Gannon, and Pamela Yates, *The Treatment of Offenders: Current Practice and New Development with An Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Steve Aos, Marna Miller, and Elizabeth Drake, Washington State Institute for Public Policy, *Evidence-Based Adult Corrections Programs: What Works and What Does Not* 5-6 (2006) (concluding after review of six "rigorous" studies that "cognitive-behavioral therapy for sex offenders on probation significantly reduces recidivism").

Such rehabilitative treatment can and should occur in the community. Kimberly Wiebrecht, *Evidence-Based Practices and Criminal Defense: Opportunities, Challenges, and Practical Considerations* 8 (2008), http://nicic.gov/library/files/023356.pdf ("[t]he research . . . states that treatment interventions are more effective when provided to defendants while they are in the community rather than in an institutional setting."); *see also* Bitna Kim et al., *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 Trauma, Violence, and Abuse 1, 11 (2016) ("The research indicates that treatment in the community is more effective than treatment in

11

institutions. Although there may be obstacles to changing existing exclusionary policies; evidence demonstrates that sex offenders, both adolescent and adult, can be treated successfully in community settings.").

Regarding how Ms. Allen's treatment needs should affect her sentence, it is important to note that the Sentencing Reform Act expressly "rejects imprisonment as a means of promoting rehabilitation." 18 U.S.C. § 3582 (mandating that the district court, when deciding whether to impose a term of imprisonment and the length of the term imposed, "recognize[ ] that imprisonment is not an appropriate means of promoting correction and rehabilitation"); *see also Mistretta v. United States*, 488 U.S. 361, 367 (1989). Accordingly, in *Tapia v. United States*, 131 S. Ct. 2382 (2011), the Supreme Court unanimously held that a district court is prohibited from imposing or increasing a term of imprisonment in order to promote rehabilitation. A lengthy period of incarceration is not necessary to achieve the goals of rehabilitation and specific deterrence. In fact, courts have found that incarceration can seriously undermine a defendant's rehabilitation because meaningful opportunities to receive mental health treatment and counseling are more often found in the community, rather than in prison. *See United States v. Crespo-Rios*, No. CRIM. 08-208, 2015 WL 6394256, at *3 (D.P.R. Oct. 19, 2015).

An extended prison sentence of more than 15 years is not necessary to protect the public from any future crimes by Ms. Allen.

  **C.**  **A sentence of 180 months is sufficient to achieve general deterrence.**

Research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the *certainty* of punishment if severity is

12

relevant at all. *See* Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, at 1; *see also Five Things About Deterrence*, National Institute of Justice, https://nij.ojp.gov/topics/articles/five-things-about-deterrence. Indeed, virtually no empirical data suggests that harsher/lengthier sentences achieve better general deterrence than moderate sentences. To the contrary, the "findings regarding general deterrence are relatively settled":

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate. . . . It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202–03 (2014) (footnotes omitted). In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203. So general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.* at 1205. In this case, 15 years would accomplish that goal.

### D. A sentence exceeding 15 years would be greater than necessary to reflect seriousness of the offense.

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender). To comply with the sufficient-but-not-greater-than-necessary standard, the Court must be cognizant of other forces that advance the congressionally outlined sentencing objectives. As discussed above, Ms. Allen will have to register as a sex offender, which will subject her to stigma. She also faces a lengthy term of federal supervision, potentially for the rest of her life. And even if she does not remain on supervision for the rest of her life, she will continue to pay for this offense in other ways.

In the end, Ms. Allen's case is a mix of aggravating and mitigating factors. While she cannot change the past, Ms. Allen is motivated to identify, and work on, all of the root causes of what led her to these actions. The mandatory minimum is more than sufficient to satisfy the sentencing factors considered by the Court.

### E. Ms. Allen's unique characteristics will affect her prison experience.

Since the outset of this matter, attempts to understand the impact of Ms. Allen's life as a transgender woman on her case, her current incarceration, her impending prison sentence, and her life going forward, along with her untreated childhood trauma and

health issues, have been a primary focus. Regarding her life as a transgender woman, the defense learned that there is a specific diagnosis of gender dysphoria. To determine how such a diagnosis should be considered with respect to her present and future incarceration, the defense consulted various sources. First, the 2002 Transgender Offender Manual issued by the Bureau of Prisons.[7] Second, a review of the criteria for gender dysphoria in the Diagnostic and Statistical Manual of Mental Disorders.[8] Third, the defense consulted with Dr. Eugene F. Simopoulos, a leading scholar in this area whose trailblazing paper remains a cornerstone publication on the treatment of incarcerated transgender patients.[9]

Dr. Simopoulos will be present to explain his findings with regard to Ms. Allen, along with the unique challenges she will face in the Bureau of Prisons, and his curriculum vitae is attached hereto.[10] *See* Exh. 1 (Eugene F. Simopoulos Curriculum Vitae). We anticipate that he will also provide special considerations and

---

[7] U.S. Bureau of Prisons, *Transgender Offender Manual* (Jan. 13, 2022), https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf.

[8] American Psychiatric Association, *Gender Dysphoria Diagnosis*, https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis (last accessed Oct. 3, 2024).

[9] Eugene F. Simopoulous and Eindra Khin Khin, *Fundamental Principles Inherent in the Comprehensive Care of Transgender Inmates*, 42 J. AM. ACAD. PSYCHIATRY LAW 26 (2014), https://www.academia.edu/download/78372711/26.full.pdf.

[10] Dr. Simopoulos' report will be filed separately under seal, subject to this Court's approval.

15

recommendations that will assist in the rehabilitation of Ms. Allen, given her diagnosis of gender dysphoria compounded by the trauma reflected in her young life.

### D.  Ms. Allen is committed to rehabilitation.

Ms. Allen fully understands the need for the sentence imposed to provide her with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. With that understanding, Ms. Allen is eager to take full advantage of every rehabilitative opportunity afforded to her while in custody, to include substance abuse treatment, mental health programming, and sex offender treatment. Hopefully, such services will be provided in a manner specialized for her, both inside and outside of prison.

## IV.  Restitution, Fines, and Special Assessments

At the time of her guilty plea, Ms. Allen agreed to pay restitution to the victims of her crimes. The government provided Ms. Allen with three claims, and she has settled those claims in the total amount of $10,000.

Regarding a fine, Ms. Allen has been deemed indigent by the Court, and there has not been a change in her financial status since the inception of this matter. Therefore, Ms. Allen requests that this Court not impose a fine.

There are also three special assessments that the Court must consider. Ms. Allen requests that this Court impose only the statutory special assessment of $100. The other two offense-specific special assessments are not mandatory. The assessment under 18 U.S.C. § 3014, in particular, is inappropriate for the same reason that a fine should not be imposed. That section requires the Court to make a finding that Ms. Allen is not indigent.

Because she remains indigent, Ms. Allen submits that a special assessment under this section should not be ordered.

Finally, when the Court considers the sentencing factors in its determination as to whether a special assessment should be applied under 18 U.S.C. § 2259A, Ms. Allen respectfully requests that this Court impose an amount no more than $100.

## CONCLUSION

Ms. Allen respectfully requests that this Honorable Court impose a sentence of 180 months. Any sentence in excess of 180 months would be greater than necessary to achieve the policy purposes of sentencing.

Respectfully submitted,

JOSEPH ALLEN

By: _____/s/_____
Suzanne V. Suher Katchmar
Assistant Federal Public Defender
Virginia State Bar No. 37387
Attorney for Joseph Allen
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0890
Facsimile: 757-457-0880
suzanne_katchmar@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 3rd day of October 2024, I will file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to:

Clayton D. LaForge
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
clayton.laforge@usdoj.gov

I FURTHER CERTIFY that I have electronically mailed this pleading to the following non-filing user:

Nicole Pender
United States Probation Officer
United States Probation Office
600 Granby Street, Suite 200
Norfolk, Virginia 23510

                                                  _____/s/_____
                                                  Suzanne V. Suher Katchmar
                                                  Assistant Federal Public Defender
                                                  Virginia State Bar No. 37387
                                                  Attorney for Joseph Allen
                                                  Office of the Federal Public Defender
                                                  500 East Main Street, Suite 500
                                                  Norfolk, Virginia 23510
                                                  Telephone: 757-457-0890
                                                  Facsimile:  757-457-0880
                                                  suzanne_katchmar@fd.org